# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 05 2016, 8:25 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Darren Bedwell
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Samuel Goldsmith, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | April 5, 2016 <br><br> Court of Appeals Case No. <br> 49A04-1508-CR-1044 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Carol J. Orbison, Judge <br><br> Trial Court Cause No. <br> 49G05-1407-F1-36675 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Samuel L. Goldsmith (Goldsmith), appeals his sentence following his conviction for attempted murder, a Level 1 felony, Ind. Code §§ 35-42-1-1(a), -41-5-1(a).

We affirm.

## ISSUE

Goldsmith raises one issue on appeal, which we restate as follows:  Whether Goldsmith's sentence is inappropriate in light of the nature of the offense and his character.

## FACTS AND PROCEDURAL HISTORY

On July 15, 2014, at approximately 8:30 p.m., seventeen-year-old M.W. arrived at her apartment on the east side of Indianapolis, Marion County, Indiana.  She noticed that several of her friends were walking on the sidewalk across the street from her apartment building.  As M.W. crossed the street to catch up with her friends, a black vehicle—an older model Buick—pulled up beside her.  The driver, later identified as Goldsmith, asked M.W. if she needed a ride.  M.W. declined, but Goldsmith persisted, driving slowly alongside M.W. as she walked on the sidewalk and demanding that she get into his vehicle.  He made his intentions clear when he told her "that he wanted some pussy and that [she] needed a ride," so she should "just get in his car before he get [sic] out and get [her]." (Tr. p. 66).  M.W.'s requests to be left alone were ignored as Goldsmith continued to say "inappropriate things" to her.  (Tr. p. 67).

[5] M.W. became angered by Goldsmith's demands, and she began kicking his vehicle and cussing at him. She reached through Goldsmith's open window and grabbed a shoe from his backseat, which she then threw at him. M.W. missed her mark, and the shoe flew through the open window and landed on the street. A resident of one of the nearby apartment complexes, Wanda Diggs (Diggs), was standing on the opposite sidewalk and witnessed the interaction between Goldsmith and M.W. Diggs indicated that, in addition to the shoe, M.W. threw other items from Goldsmith's backseat onto the street. By this point, M.W.'s friends had turned back to assist and were yelling at Goldsmith to leave M.W. alone.

[6] After M.W. and her friends walked away from Goldsmith, Goldsmith did a U-turn and stopped to retrieve his shoe and other belongings. As Goldsmith was collecting his property from the street, Diggs "could see the look on his face and he was mad." (Tr. p. 144). Although Diggs warned Goldsmith to "just leave it alone[,]" Goldsmith did another U-turn and said, "Watch this, I'm going to hit that bitch." (Tr. p. 146). Goldsmith nearly collided with another vehicle in the course of that U-turn, and the driver of the other vehicle clearly saw "a big smile" on Goldsmith's face. (Tr. p. 189). Diggs "hollered for [M.W. and her friends] to get out of the way" as Goldsmith "gunned it." (Tr. p. 174). M.W. turned around to see that Goldsmith had driven up onto the sidewalk and was rapidly approaching her. M.W. did not have time to react before Goldsmith ran her over and dragged her for approximately forty-five feet. The impact shattered the grille of Goldsmith's vehicle.

Right after Goldsmith hit M.W., several gunshots were fired, although it is not clear from where the shots originated.[1] Goldsmith sped away from the scene without stopping. At some point after being struck, M.W. lost consciousness. She suffered from a broken femur, which required surgery, as well as other scrapes. Due to her injuries, M.W. spent approximately four months in physical therapy. M.W. is now able to walk, but her gait is different and she continues to experience pain.

On July 24, 2014, the State filed an Information charging Goldsmith with Count I, attempted murder, a Level 1 felony, I.C. §§ 35-42-1-1(a), -41-5-1(a); Count II, aggravated battery, a Level 3 felony, I.C. § 35-42-2-1.5(2); and Count III, battery with a deadly weapon, a Level 5 felony, I.C. § 35-42-2-1(b)(1), (f)(2). Count III, which alleged that Goldsmith ran over the foot of one of M.W.'s friends, was dismissed prior to trial. On June 29-30, 2015, the trial court conducted a jury trial. At the close of the evidence, the jury returned guilty verdicts on the remaining Counts I and II.

On July 15, 2015, the trial court held a sentencing hearing. Due to double jeopardy concerns, the trial court merged Count II into Count I and entered a judgment of conviction for attempted murder, a Level 1 felony. The trial court

---

[1] During the trial, a detective testified that he suspected the shooter was one of M.W.'s friends, but there was insufficient evidence to establish this.

imposed the maximum sentence of forty years, fully executed in the Indiana Department of Correction (DOC).

[10] Goldsmith now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

[11] Goldsmith claims that his sentence is inappropriate. It is well established "that sentencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). In this case, the trial court ordered a fully executed sentence of forty years—the maximum sentence for a Level 1 felony. I.C. § 35-50-2-4(b). Goldsmith, however, asserts that he should have been sentenced to the advisory term of thirty years. *See* I.C. § 35-50-2-4(b). Even where, as here, the trial court imposes a statutorily permissible sentence, our court may revise the sentence if, "after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B).

[12] The goal of sentence review under Appellate Rule 7(B) "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell*, 895 N.E.2d at 1225. Ultimately, whether we consider a sentence to be inappropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Id.*

at 1224. While "'reasonable minds may differ' on the appropriateness of a sentence[,]" we focus on "the length of the aggregate sentence and how it is to be served." *Parks v. State*, 22 N.E.3d 552, 555 (Ind. 2014) (quoting *Buchanan v. State*, 767 N.E.2d 967, 970 (Ind. 2002)); *Cardwell*, 895 N.E.2d at 1224. "The question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate." *Helsley v. State*, 43 N.E.3d 225, 228 (Ind. 2015). Goldsmith bears the burden of proving that his sentence is inappropriate. *Gleason v. State*, 965 N.E.2d 702, 712 (Ind. Ct. App. 2012) (citing *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006)).

[13] We first consider the nature of the offense. Here, forty-seven-year-old Goldsmith observed seventeen-year-old M.W. walking down the sidewalk, and he supposedly mistook her for a prostitute. She repeatedly refused his demands for "some pussy" and tried to fend him off by throwing a shoe and other items at him and by kicking his vehicle and cussing at him. (Tr. p. 66). Angered, Goldsmith turned his vehicle around and "gunned it." (Tr. p. 174). He drove up onto the sidewalk, where M.W. was walking away from Goldsmith, and he ran her down. She was dragged for approximately forty-five feet and sustained serious injuries, including loss of consciousness and a broken femur.

[14] Goldsmith asserts that "the circumstances of the [a]ttempted [m]urder in this case were not among the worst this [c]ourt has seen. Running over M.W. was not part of a criminal plan, thought out in advance, but was purely an impulsive, spur of the moment act." (Appellant's Br. p. 12). We disagree.

Although Goldsmith initially turned in the opposite direction of M.W. to retrieve his belongings, he clearly made a deliberate decision to exact revenge on M.W. for rejecting and disrespecting him. Accordingly, he made a second U-turn—endangering at least one other driver in doing so—and told the bystanders, "Watch this, I'm going to hit that bitch." (Tr. p. 146). After running her over, Goldsmith fled from the scene. As the trial court found, it is

> absolutely astonish[ing] that [M.W.] isn't dead. She was hit with such force by the impact of . . . Goldsmith's vehicle that the front [grille] was broken in several pieces. She was dragged a certain distance and the fact that she is able to walk into this courtroom during this trial and testify to this . . . is astonishing. . . . Goldsmith is very lucky that he did not kill her by his actions.

(Tr. pp. 319-20).

[15] Additionally, we are unimpressed with Goldsmith's attempt to shift the blame for the incident to M.W., arguing that she was the one who "escalated the encounter beyond words and threats" by tossing his belongings onto the street, kicking his vehicle, and using "vile language." (Appellant's Br. p. 12). We find no merit in Goldsmith's feeble attempt to distract us from the fact that M.W. is the victim in this case. Using his own vile language, Goldsmith repeatedly tried to solicit sex from a minor; he ignored her pleas to be left alone and eventually ran her over with a smile on his face. Goldsmith could not reasonably have expected our court to find that his nearly-lethal conduct was justified because he was provoked by foul language and the rejection of a teenage girl.

[16] Turning to the character of the offender, the record is devoid of any redeeming qualities that would warrant a sentence revision. Goldsmith acknowledges his criminal history, but he argues that "[m]ost of [his] prior offenses are unlike the current one[,]" and his "record does not place him in the worst category of offenders." (Appellant's Br. pp. 13-14). While the instant offense is Goldsmith's first conviction for attempted murder, we nevertheless find that Goldsmith's extensive criminal history is reflective of his poor character and disdain for the laws that govern our state. The trial court found that Goldsmith has been arrested at least fifty-six times. Between 1987 and 2013, Goldsmith was convicted of twelve felonies, including: resisting law enforcement, possession of cocaine, theft/receiving stolen property (eight times), dealing in cocaine, and auto theft/receiving stolen parts. During this time, he was also convicted of eighteen misdemeanors, including: criminal conversion (five times), driving with a suspended license (three times), check deception, failure to stop after an accident resulting in property damage, battery, criminal trespass (two times), prostitution, public intoxication, operating a vehicle without ever receiving a license, operating while intoxicated, and malicious injury to personal property of at least $2,000 (South Carolina).

[17] For his prior criminal actions, Goldsmith was frequently afforded leniency with suspended sentences, probation, home detention, and fines. Instead of taking advantage of these opportunities to turn his life around, Goldsmith had his probation revoked at least seven times, committed approximately five parole violations, and had his home detention privileges revoked twice. Moreover,

none of these measures were sufficient to deter him from committing the present offense. Goldsmith's refusal to lead a law-abiding life is also evidenced by his admission that on the day he hit M.W., he was under the influence of both alcohol and cocaine. Despite Goldsmith's insistence that he did not strike M.W. intentionally—claiming instead that his "blood sugar was low[,] I have diabetes and [was] dranking [sic]"—he expressed no remorse for the injuries he inflicted upon her. (Appellant's Conf. App. p. 140). Contrary to Goldsmith's argument, the nature of the offense and his character do not entitle him to a sentence revision. We therefore affirm the forty-year sentence imposed by the trial court.

## CONCLUSION

[18] Based on the foregoing, we conclude that Goldsmith's sentence is not inappropriate.

[19] Affirmed.

[20] Najam, J. and May, J. concur